UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATRICIA HAMILTON,

                    Plaintiff,

          -v.-

FRANK DEGENNARO and THE NEW YORK
CITY DEPARTMENT OF EDUCATION,

                    Defendants.

17 Civ. 7170 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

On March 17, 2016, two staff members at The Stephen D. McSweeney School ("P721X") notified Principal Frank DeGennaro that they had witnessed Plaintiff Patricia Hamilton use corporal punishment with a student. That report sparked a months-long investigation that eventually culminated in Plaintiff's termination. Plaintiff brought suit against DeGennaro and the New York City Department of Education (jointly "Defendants"), alleging employment discrimination on the basis of race and national origin in violation of Title VII of the Civil Rights Act of 1964, *codified as amended at* 42 U.S.C. §§ 2000e to 2000e-17; intentional employment discrimination on the basis of race in violation of 42 U.S.C. § 1981; employment discrimination on the basis of age in violation of the Age Discrimination in Employment Act of 1967 (the "ADEA"), 29 U.S.C. §§ 621-634; as well as discrimination in violation of the New York State Human Rights Law, N.Y. Exec. Law §§ 290-297 (the "NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-107 to 8-131 (the "NYCHRL"). At a later stage in the litigation, the parties stipulated to the

dismissal with prejudice of all claims save Plaintiff's Title VII and ADEA claims. Defendants now move for summary judgment on the remaining two claims, contending that there is no triable issue as to whether Plaintiff's termination was due to discrimination on the basis of Plaintiff's identity as an African American, Jamaican American woman over the age of 40, and that they are entitled to judgment as a matter of law. For the reasons set forth below, Defendants' motion is granted.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    Plaintiff's Background

Plaintiff is an African American woman who identifies as Jamaican American and holds dual Jamaican-American citizenship. (Def. 56.1 Reply ¶¶ 2-3). During the incidents at issue in this litigation, she was 58 years old. (*Id.* at ¶ 1). Until her termination in 2016, Plaintiff had been employed as a

---

[1]    The facts set forth in this Opinion are drawn from the Addendum to the Amended Complaint ("Addendum to Compl." (Dkt. #7)); Defendants' reply statement to Plaintiff's response to Defendants' Local Rule 56.1 Statement ("Def. 56.1 Reply" (Dkt. #63)); and the exhibits attached to the Declaration of Alana R. Mildner ("Mildner Decl., Ex. [ ]" (Dkt. #54)). For ease of reference, Defendants' opening brief is referred to as "Def. Br." (Dkt. #56); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #59); and Defendants' reply brief as "Def. Reply" (Dkt. #62).

Citations to a party's 56.1 Statement incorporate by reference the documents cited therein. Where facts stated in a party's 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true. *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

paraprofessional with the New York City Department of Education (the "DOE") since November 22, 1999, and since September 2000 she had worked at P721X, a school that served special-education students. (*Id.* at ¶¶ 4, 6). As a paraprofessional, Plaintiff was responsible for helping students with their work, accompanying students from their homes to school and back, assisting students with eating lunch and using the restrooms, and preparing students for field trips. (*Id.* at ¶ 5).

Up until March 2016, there is no evidence indicating that Plaintiff had ever been warned or disciplined for any professional misconduct. (Def. 56.1 Reply ¶¶ 115-20). During the 2015-2016 school year, Plaintiff was assigned as a one-on-one paraprofessional for J.P., a student who was approximately 13 or 14 years old at the time of the initial incident. (*Id.* at ¶¶ 9-10). For that same school year, J.P. was a student in Ms. Kerri Carter's class. (*Id.* at ¶ 13).

### 2. The Corporal Punishment Incident of March 17, 2016

In the early afternoon of March 17, 2016, Nicole DeSantis, a teacher, and Nicole Maskara, a paraprofessional, informed Defendant DeGennaro, the principal for the preceding four years, that they had witnessed Plaintiff administer corporal punishment to a student. (Def. 56.1 Reply ¶¶ 7, 15). DeSantis and Maskara informed DeGennaro that at around 12:12 p.m., they had noticed unsupervised students being rowdy in the hallway. (*Id.* at ¶ 16; *see also* Mildner Decl., Ex. M). Both DeSantis and Maskara were waiting outside DeSantis's classroom and watching the students when DeSantis saw J.P. go "flying" through the door of Carter's classroom, which was located

across the hallway.  (Def. 56.1 Reply ¶ 17; *see also* Mildner Decl., Ex. M, N).

DeSantis and Maskara then saw Plaintiff approach A.C., another student in

Carter's class who has Down's Syndrome.  (Def. 56.1 Reply ¶¶ 12-13, 18).

DeSantis and Maskara told DeGennaro that they saw Plaintiff grab A.C. by his

belt and arms and yell at him.  (*Id.* at ¶ 18).

DeGennaro instructed both DeSantis and Maskara to write statements

and said that he would report the incident through the Online Occurrence

Reporting System.  (Def. 56.1 Reply ¶ 19).  Plaintiff denied, and continues to

deny, that she yelled at or grabbed A.C., and admits that, at most, she tapped

A.C. on his outer left thigh with the palm of her hand.  (*See, e.g., id.* at ¶ 18;

*see also id.* at ¶ 44).  The following day, Plaintiff was suspended without pay

pending the outcome of an investigation into the corporal punishment

allegation, and Plaintiff in turn filed a grievance through her union to challenge

her suspension.  (*Id.* at ¶¶ 45-46).

### 3.    DeGennaro Investigates the Corporal Punishment Allegation

Between March 17, 2016, and June 13, 2016, DeGennaro investigated

the allegation that Plaintiff had used corporal punishment on A.C.  (Def. 56.1

Reply ¶¶ 19, 70).  In the course of that investigation, DeGennaro interviewed

(*see* Mildner Decl., Ex. D at 126:12-15) and collected written statements from

Plaintiff (*id.*, Ex. T), A.C. (*id.*, Ex. G), Carter (*id.*, Ex. L, P), DeSantis (*id.*, Ex. M),

Maskara (*id.*, Ex. N), Nurse Karlene Kerr (*id.*, Ex. F, O), Paraprofessional

Joanne Small (*id.*, Ex. J, K), and two other students (*id.*, Ex. H, I).

DeGennaro first spoke with A.C. on March 17, 2016, at which time A.C. said Plaintiff's name and pointed to a scratch on his arm. (Def. 56.1 Reply ¶ 20). DeGennaro took a photograph of A.C.'s arm that day. (*Id.* at ¶ 21).[2] Also that day, DeGennaro and Assistant Principal Christopher Dugan interviewed two other students, J.C. and J.B. (*Id.* at ¶¶ 31-32). J.C. told DeGennaro that J.C. saw A.C. trip J.P., and that Plaintiff then grabbed A.C. and tried to pull him off the bench. (*Id.* at ¶ 31). J.B. told Dugan that he saw much of the same, except with the added detail that before Plaintiff grabbed A.C.'s arm, Plaintiff tried to get A.C. to come into class and A.C. did not comply. (*Id.* at ¶ 32).

On March 22, 2016, Nurse Kerr wrote a statement explaining that Plaintiff brought both A.C. and J.P. to Nurse Kerr's office on March 17, 2016. (Def. 56.1 Reply ¶ 23). Nurse Kerr wrote that she observed scratches on A.C.'s cheek, neck, and forearm. (*Id.* at ¶ 24). When Nurse Kerr asked A.C. about the scratches, A.C. initially said that Plaintiff scratched him, but then stated that J.P. caused the scratches. (*Id.* at ¶ 25). Nurse Kerr also observed streaks of dried blood on A.C.'s fingernails and what appeared to be skin under his nails. (*Id.* at ¶ 24). Nurse Kerr wrote that she believed A.C.'s scratches were self-inflicted. (*Id.* at ¶ 25). On May 3, 2016, Nurse Kerr supplemented her

---

[2] Plaintiff disputes that there is a sufficient foundation to assert that the photograph (Mildner Decl., Ex. E) is of A.C.'s arm. After reviewing the deposition transcript of DeGennaro (*id.*, Ex. D at 179:15-181:12), the Court finds that there is no genuine dispute as to whether DeGennaro took a photograph of A.C.'s arm. DeGennaro readily identified the photograph as one he took upon inspection, and his statement of, "I'm pretty sure I took it," does not indicate actual uncertainty as to whether he took the photograph or whether the photograph is of A.C.'s arm.

statement, writing that March 17, 2016, was the first time she knew about A.C. having scratches of that nature. (Mildner Decl., Ex. O). Nurse Kerr did write, however, that A.C. was brought to her office a week later for scratches on his neck and face. (*Id.*). When Nurse Kerr asked A.C. how the injury occurred, A.C. blamed a paraprofessional who had not been present in school at the time. (*Id.*). When Nurse Kerr asked him again, A.C. said it happened while he was asleep. (*Id.*). Nurse Kerr called A.C.'s mother about the more recent scratches, and she stated that they were caused by the hose of A.C.'s CPAP machine. (*Id.*).

On March 28, 2016, DeGennaro met with Plaintiff and her union representative for a Step I grievance hearing regarding Plaintiff's grievance. (Def. 56.1 Reply ¶ 55). Plaintiff asserted that she was innocent of the corporal punishment allegations. (*Id.* at ¶ 56). In relevant part, Plaintiff told DeGennaro that A.C. tripped J.P.; that she told A.C. that, as punishment, A.C. would not be able to go to a scheduled party; and that she patted A.C. on the belt in an attempt to get him to move off a bench in the hallway. (*Id.* at ¶¶ 57-58). At the conclusion of the meeting, DeGennaro denied Plaintiff's grievance, determining that there was no violation of the applicable collective bargaining agreement, and that Plaintiff would remain suspended without pay pending the conclusion of the investigation. (*Id.* at ¶ 60).

On March 29, 2016, Small, who worked in Carter's classroom with Plaintiff, wrote a statement simply stating that she was at lunch at the time of the incident and did not see anything transpire between Plaintiff and A.C. (Def.

56.1 Reply ¶¶ 14, 33).  On May 23, 2016, Small supplemented her statement and informed DeGennaro that she had taken A.C. to the nurse's office in the past for scratches, but had not noticed any scratches on March 17, 2016.  (*Id.* at ¶ 34).

On April 4, 2016, DeGennaro spoke with A.C. again about the incident. (Def. 56.1 Reply ¶ 27).  A.C. told DeGennaro that, on March 17, 2016, he was sitting on the bench when Plaintiff pushed his arms, scratched him, and pulled him by his belt and pants.  (*Id.* at ¶ 28).  DeGennaro testified that due to A.C.'s difficulty with writing, DeGennaro handwrote a statement based on what A.C. had told him, read the statement back to A.C., and had A.C. confirm that it was correct before signing his name at the bottom.  (*Id.* at ¶¶ 29-30).

On April 7, 2016, Carter wrote a statement explaining that on March 16, 2017, she was in her classroom with the door closed during her lunch period when J.P. opened the classroom door and fell into the room.  (Def. 56.1 Reply ¶ 35).  Carter wrote that she spoke with A.C. to try and determine what had happened, but he appeared upset and was unable to verbalize what was wrong. (Mildner Decl., Ex. L).  A.C. was mumbling, but all Carter could understand him saying was "Mrs. Hamilton."  (*Id.*).  Carter also noticed a scratch on A.C.'s arm and asked him if he got hurt, but A.C.'s only response was to repeat "Mrs. Hamilton" again.  (*Id.*).  After speaking with A.C. and J.P. and sending both to the nurse's office with Plaintiff, Carter spoke with DeSantis and Maskara, whom she had noticed in the hallway when she had gone out to speak to A.C. (*Id.*).  DeSantis and Maskara told Carter that they had seen Plaintiff interact

with A.C. in a rough way, and that they were not comfortable with what they saw. (*Id.*). DeSantis and Maskara asked Carter if she intended to report anything, and Carter told them that she had not witnessed anything that needed to be reported. (*Id.*). Carter also wrote that later that afternoon, she received a call from DeGennaro, who asked her and A.C. to come in to speak about the incident. (*Id.*). When questioned about the scratch on his arm, A.C. said "Mrs. Hamilton did it." (*Id.*). Moreover, A.C. also pulled on his belt and pants and said, "she did this," in reference to Plaintiff. (*Id.*). In a supplemental statement on May 17, 2016, Carter wrote that she did not recall A.C. having a scratch when he came to school on March 17, 2016. (*Id.* at ¶ 43).

On April 19, 2016, DeSantis wrote a statement stating that on March 17, 2016, Maskara informed her of rowdy students in the hallway. (Def. 56.1 Reply ¶ 38). When DeSantis walked into the hallway, she saw Plaintiff approach A.C., who was sitting on a bench at the time. (*Id.*). DeSantis wrote that Plaintiff told A.C. to get up, and when A.C. did not comply, Plaintiff pulled A.C. by his belt area and then grabbed both of his arms and pulled him. (*Id.*). Similarly, Maskara wrote a statement on April 21, 2016, stating that on March 17, 2016, she saw Plaintiff put her hands on A.C.'s upper arms and pull him. (*Id.* at ¶ 39).

On June 13, 2016, DeGennaro met with Plaintiff and her union representative to discuss the results of the investigation into the corporal punishment allegations. (Def. 56.1 Reply ¶ 70). DeGennaro discussed the statements he had received from students and staff members and noted that

despite some differences in minor details, the witnesses' statements were largely consistent with one another. (*Id.* at ¶¶ 71-72). DeGennaro told Plaintiff that he had concluded that Plaintiff had administered corporal punishment on March 17, 2016, and that even if there had been a physical altercation between A.C. and J.P., Plaintiff's interactions with A.C. were still in violation of the Chancellor's regulation concerning corporal punishment. (*Id.* at ¶¶ 71, 73).

### 4.    DeGennaro Determines that Plaintiff Impeded the Investigation

A separate issue concerned allegations that Plaintiff had impeded the corporal punishment investigation. On March 17, 2016, after the incident with A.C., Plaintiff learned from Carter that DeSantis had reported Plaintiff's conduct to DeGennaro. (Def. 56.1 Reply ¶ 47). DeSantis approached Maskara and Plaintiff, who were having a conversation in the hallway, and Plaintiff asked DeSantis if she had witnessed Plaintiff abuse a student. (*Id.* at ¶ 49). Plaintiff said to DeSantis, "You tell her to lie on me. Someone is going to tell a lie on you. What goes around comes around." (*Id.* at ¶ 50). Plaintiff later testified that her statement "what goes around comes around" was a reference to "karma." (*Id.* at ¶ 51). DeSantis reported Plaintiff's comments to DeGennaro and told DeGennaro that Plaintiff's comments had upset her. (Mildner Decl., Ex. S at 129:2-5, 130:7-10). DeSantis testified that she did not recall ever telling DeGennaro that she felt threatened by Plaintiff (*id.* at 130:21-131:2), but she did testify that she thought Plaintiff was threatening her (*id.* at 122:23-25). DeGennaro asked DeSantis and Maskara to submit written statements. (Def. 56.1 Reply ¶ 54). Later, at Plaintiff's grievance hearing on March 28, 2016,

Plaintiff admitted that she had said, "what goes around comes around." (*Id.* at ¶ 59).

On April 21, 2016, DeGennaro wrote to Plaintiff, notifying her that there would be a meeting on May 2, 2016, to discuss the corporal punishment allegation. (Def. 56.1 Reply ¶ 61). The letter specifically instructed Plaintiff not to discuss the details of the investigation with anyone at P721X, other than her union representative. (*Id.* at ¶ 62). At the meeting on May 2, 2016, at which DeGennaro, Dugan, Plaintiff, and Plaintiff's union representative were present, DeGennaro showed Plaintiff statements from DeSantis and Maskara regarding Plaintiff's comments on March 17, 2016. (*Id.* at ¶¶ 63-64). Plaintiff admitted to confronting DeSantis and Maskara and stating, "what goes around comes around," but stated that she did not believe it was a threat. (*Id.* at ¶ 65; *see also* Mildner Decl., Ex. V).

Later that evening, Plaintiff called Carter. (Def. 56.1 Reply ¶ 66). There is considerable dispute in the record as to the purpose of the phone call and what was said on the call. (*Compare* Mildner Decl., Ex. A at 101:24-105:18, *with id.*, Ex. W). Plaintiff testified that she called Carter because she had heard from Small that Carter was worried about her and the students were concerned. (*Id.*, Ex. A at 102:17-24). Plaintiff testified that most of the conversation was about students, but Plaintiff also testified that Carter told her on the call that DeGennaro had instructed Carter to change her story to indicate that Plaintiff had "roughed up students." (*Id.* at 103:9-19, 104:4-9). By contrast, Carter wrote in a statement dated May 17, 2016, that she did not

know the purpose of Plaintiff's call. (*Id.*, Ex. W). Carter wrote that Plaintiff seemed annoyed about a meeting she had had with DeGennaro and Dugan. (*Id.*). Carter does not mention in that statement, or in any statement, that DeGennaro or another member of the administration asked her to change her story. The two undisputed facts concerning the May 2, 2019 call are that Plaintiff told Carter not to trust the administration, and Dugan in particular, and that Plaintiff warned Carter that she would be called in for questioning in the near future regarding why her classroom door was closed at the time of the incident and about whether the school bells were working properly that day. (*Compare id.* at 104:4-105:14, *with id.*, Ex. W). Carter reported the phone call to DeGennaro. (Def. 56.1 Reply ¶ 67).

On July 7, 2016, DeGennaro informed Plaintiff that he had concluded that Plaintiff's comments to DeSantis and Maskara on March 17, 2016, were threats designed to impede the investigation into whether Plaintiff committed corporal punishment. (Def. 56.1 Reply ¶ 75). DeGennaro noted that Plaintiff's suspension would continue, as the investigation was not yet complete. (*Id.*).

On September 29, 2016, DeGennaro met with Plaintiff and her union representative regarding the allegation that Plaintiff impeded the investigation by calling Carter on May 2, 2016. (Def. 56.1 Reply ¶ 76). DeGennaro asked Plaintiff if she remembered calling Carter and warning Carter not to talk to Dugan, Plaintiff responded, "I have nothing to say." (Mildner Decl., Ex. Y).

On November 7, 2016, DeGennaro informed Plaintiff that he had concluded, based on Carter's statement and Plaintiff's response in the meeting

on September 29, 2016, that Plaintiff had impeded the investigation by contacting Carter and telling her not to trust the administration. (Def. 56.1 Reply ¶ 78). DeGennaro also informed Plaintiff that in light of the substantiated finding of corporal punishment and two instances of witness intimidation, there was good and sufficient reason to terminate Plaintiff's DOE employment. (*Id.* at ¶ 79). Plaintiff was thereby terminated, effective November 7, 2016. (*Id.* at ¶ 80).

### 5. Plaintiff's Post-Termination Activities

Plaintiff filed a complaint with the New York State Division of Human Rights (the "SHDR") on December 9, 2016, alleging that her termination had been discriminatory on the basis of her age, national origin, and race/color. (Def. 56.1 Reply ¶ 82). In her complaint, Plaintiff alleged that she was falsely accused of scratching a special needs student and suspended without pay pending investigation, and that DeGennaro pressured school staff members to write up additional false allegations against her. (Mildner Decl., Ex. Z). On June 9, 2017, the SDHR issued a Determination and Order finding "no probable cause" as to Plaintiff's complaint. (*Id.*, Ex. AA).

In its Determination, the SDHR noted that the DOE had offered several non-discriminatory reasons for Plaintiff's termination: (i) Plaintiff was believed to have committed an act of corporal punishment against a student; and (ii) Plaintiff impeded the DOE's investigation into the allegations of corporal punishment. (Mildner Decl., Ex. AA). The SDHR stated that it had "not found these non-discriminatory reasons to be unworthy of credence and a pretext for

discrimination." (*Id*.). Additionally, the SDHR "did not uncover sufficient evidence to establish a causal nexus between the [DOE's] treatment of the complainant and her race/color, national origin and/or age." (*Id*.).

## B.    Procedural Background

Plaintiff filed her initial complaint *pro se* in this action on September 20, 2017. (Dkt. #2). On February 6, 2018, Plaintiff filed an amended complaint (the "Complaint"), alleging claims of: (i) discrimination based on race and national origin under Title VII; (ii) intentional employment discrimination on the basis of race under 42 U.S.C. § 1981; (iii) employment discrimination on the basis of age under the ADEA; (iv) employment discrimination on the basis of age, race, and national origin under the NYSHRL; and (v) employment discrimination on the basis of age, race, and national origin under the NYCHRL. (Dkt. #7). Plaintiff also alleged that she was harassed and subjected to a hostile work environment. (*Id*.).

On August 29, 2018, Plaintiff acquired limited *pro bono* counsel and the parties appeared before the Court for an initial pretrial conference. (Dkt. #30-32). The parties conducted discovery, and on March 5, 2019, Defendants filed a motion for summary judgment along with an accompanying memorandum of law and declaration. (Dkt. #53, 54, 56). Following Defendants' opening submission, the parties stipulated to the dismissal with prejudice of all of Plaintiff's claims except for her Title VII and ADEA discrimination claims. (Dkt. #58). Plaintiff filed a brief in opposition to Defendants' motion for summary

judgment, as well as a supporting declaration, on April 12, 2019. (Dkt. #59, 60). Defendants filed their reply brief on April 26, 2019. (Dkt. #62).

## DISCUSSION

### A. Applicable Law

#### 1. Summary Judgment Under Fed. R. Civ. P. 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).[3]  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks and citation omitted).  A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248.  "In assessing the record to determine whether there is a genuine issue to be tried, we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Gorzynski* v.

---

[3]  The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word – genuine 'issue' becomes genuine 'dispute.' 'Dispute better reflects the focus of a summary-judgment determination.").  This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refers to "genuine issues of material fact."

*JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (citing *Anderson*, 477 U.S. at 255).

While the moving party "bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,'" *ICC Chem. Corp.* v. *Nordic Tankers Trading a/s*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Catrett*, 477 U.S. at 323), the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Brown* v. *Henderson*, 257 F.3d 246. 252 (2d Cir. 2001). Rather, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Parks Real Estate Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)).

Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist. *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)). "Though [the Court] must accept as true the allegations of the party defending against the summary judgment motion ... conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak* v. *City of N.Y.*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citation omitted) (citing *Matsushita*, 475 U.S. at 587; *Wyler* v. *United States*, 725 F.2d 156, 160 (2d Cir. 1983)); *accord Hicks*, 593 F.3d at 166. "Where the record taken as a whole could not lead a rational trier of fact to find

for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587. "If the evidence is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted). It should also be noted that "the principles governing admissibility of evidence do not change on a motion for summary judgment. ... [O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Presbyterian Church of Sudan* v. *Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) (internal quotation marks omitted) (quoting *Raskin* v. *Wyatt Co.*, 125 F.3d 55, 65-66 (2d Cir. 1997)).

The Second Circuit "has repeatedly emphasized the need for caution about granting summary judgment to an employer in a discrimination case where ... the merits turn on a dispute as to the employer's intent." *Gorzynski*, 596 F.3d at 101 (internal quotation marks omitted) (quoting *Holcomb* v. *Iona College*, 521 F.3d 130, 137 (2d Cir. 2008). "Where an employer acted with discriminatory intent, 'direct evidence of that intent will only rarely be available, so ... affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Id.* Nevertheless, "[f]or a plaintiff to survive a motion for summary judgment in a discrimination case, she must offer concrete particulars to substantiate her claim." *Stathalos* v. *Gala Res., LLC*, No. 06 Civ. 13138 (RLC), 2010 WL 2024967, at *4 (S.D.N.Y. May 21, 2010) (internal citations and quotation marks omitted). "The summary judgment rule would be rendered sterile ... if the mere

incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri* v. *Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

## 2. Title VII and the ADEA

Title VII provides that "it shall be an unlawful employment practice for an employer … to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The ADEA provides that "it shall be unlawful for an employer … to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

Discrimination claims under Title VII and the ADEA are governed by the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Vega* v. *Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 82-83 (2d Cir. 2015); *see also Gorzynski*, 596 F.3d at 106. Under this framework,

> the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. If the plaintiff does so … the defendant [must] articulate some legitimate, nondiscriminatory reason for its action. If such a reason is provided, plaintiff … may still prevail by showing … that the employer's determination was in fact the result of [discrimination].

*Holcomb*, 521 F.3d at 138 (internal quotation marks and citations omitted).

To establish a *prima facie* case of discrimination under both Title VII and the ADEA, a plaintiff must show (i) she is a member of a protected class; (ii) she is qualified for her position; (iii) she suffered an adverse employment action; and (iv) the circumstances give rise to an inference of discrimination.  *See Vega*, 801 F.3d at 83; *see also Gorzynski*, 596 F.3d at 107.  "This burden is not a heavy one." *Gorzynski*, 596 F.3d at 107.  An "adverse employment action include[s] a termination of employment." *Cotterell* v. *Gilmore*, 64 F. Supp. 3d 406, 422 (E.D.N.Y. 2014) (internal quotation marks omitted) (citing *Beyer* v. *Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008).  The fourth prong of the *prima facie* case can be satisfied by circumstances such as "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's adverse employment action." *Barella* v. *Vill. Of Freeport*, 16 F. Supp. 3d 144, 162 (E.D.N.Y. 2014).  Additionally, "the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage." *Zimmerman* v. *Assocs. First Capital Corp.*, 251 F.3d 376, 380-81 (2d Cir. 2001); *see also Gorzynski*, 596 F.3d at 107.

Once a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the discrimination.  *See Patterson* v. *Cty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004).  "Defendants' burden at this stage is not to prove

nondiscrimination. Instead, defendants must introduce evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *Albuja* v. *Nat'l Broad. Co. Universal*, 851 F. Supp. 2d 599, 610 (S.D.N.Y. 2012) (internal quotation marks omitted). "The employer's explanation must be clear and specific." *Dister* v. *Cont'l Grp., Inc.*, 859 F.2d 1108, 1115 (2d Cir. 1988) (internal citation and quotation marks omitted).

If the employer articulates a legitimate, nondiscriminatory reasons for the adverse action, "the burden shifts back[4] to the plaintiff to prove that the employer's reason 'was in fact pretext' for discrimination." *Vega*, 801 F.3d at 83 (citing *McDonnell Douglas*, 411 U.S. at 804). At this final stage, the standards for Title VII claims and ADEA claims diverge. *See Gorzynski*, 596 F.3d at 106. In the Title VII context, the plaintiff "must establish 'circumstances that would be sufficient to permit a rational finder of fact to infer that the employer's employment decision was more likely than not based in whole or in part on discrimination.'" *Sullivan* v. *N.Y.C. Dep't of Investigation*, 163 F. Supp. 3d 89, 99 (S.D.N.Y. 2016) (quoting *Kirkland* v. *Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014)). ADEA claims face a higher standard —

---

[4]     Although it has little practical effect in this case, the Court notes that when the Second Circuit discusses the third step of the *McDonnell-Douglas* framework in the ADEA context, it says that the plaintiff "can no longer rely on the *prima facie* case, but must prove that the employer's proffered reason was a pretext for discrimination." *See Delaney* v. *Bank of Am. Corp.*, 766 F.3d 163, 168 (2d Cir. 2014) (internal citations and quotation marks omitted) (citing *Gorzynski* v. *JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010); *McPherson* v. *N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006)). This stands in contrast to the Second Circuit's language in Title VII cases, wherein it refers to the burden shifting back to the plaintiff.

plaintiffs must prove, by a preponderance of the evidence, that age was the "but-for" cause of the adverse action, as opposed to merely being a motivating factor. *See Gorzynski*, 596 F.3d at 106 (quoting *Gross* v. *FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009)).

## B.    Analysis

### 1.    Plaintiff Satisfies Her Initial Burden

The Court begins by addressing whether Plaintiff has met her initial burden of establishing a *prima facie* case of discrimination under both Title VII and the ADEA. It is plain, and Defendants willingly concede (Def. Br. 7), that Plaintiff, as a 58-year-old, African American woman of Jamaican origin and citizenship (Def. 56.1 Reply ¶¶ 1-3), is a member of multiple protected classes and that she suffered an adverse employment action: termination (*id.* at ¶ 80). There is also no evidence to suggest that Plaintiff was not qualified for her position as a paraprofessional. Therefore, the only area of contention is whether Plaintiff has demonstrated that the circumstances of her termination give rise to an inference of discrimination.

Defendants argue that Plaintiff has failed on this point because she has identified neither overtly discriminatory statements nor adequate comparators. (*See* Def. Br. 7). However, Defendants overestimate the weight of Plaintiff's burden at this stage. As the Second Circuit has noted, the evidence necessary to satisfy this initial burden is minimal, or even *de minimis*. *See Zimmerman*, 251 F.3d at 381. Indeed, "the mere fact that a plaintiff was replaced by someone outside the protected class will suffice." *Id.*; *see also Thomas* v. *iStar*

*Fin., Inc.*, 438 F. Supp. 2d 348, 359 (S.D.N.Y. 2006), *aff'd,* 629 F.3d 276 (2d Cir. 2010); *Gorzynski*, 596 F.3d at 107.  In this action, Plaintiff's duties after her termination were assumed by Pamela Perdomo Hernandez, who is approximately 30 years old and is believed to be Hispanic and of Dominican origin.  (Def. 56.1 Reply ¶ 81).  It is of no moment that Ms. Hernandez was already an employee at P721X (*id.*), as an inference of discrimination can arise as much from a reassignment of duties as from a replacement by an outside hire, *see Montana* v. *First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 105 (2d Cir. 1989).  Plaintiff's replacement by someone outside of all of her protected classes is enough to satisfy the minimal burden for both her Title VII and ADEA claims.  The Court finds that Plaintiff has established a *prima facie* case of discrimination.

### 2. Defendants Have Articulated Legitimate, Nondiscriminatory Reasons for Plaintiff's Termination

Much as it is clear that Plaintiff has satisfied the first step of *McDonnell Douglas*, it is equally clear that Defendants have successfully satisfied the second step by articulating legitimate, nondiscriminatory reasons for Plaintiff's termination.  Defendants state that they terminated Plaintiff not for any discriminatory reason, but because DeGennaro concluded, after a full and fair investigation, that Plaintiff used corporal punishment on March 17, 2016, and then interfered in the investigation through her interactions with Carter, DeSantis, and Maskara.  (*See* Def. Br. 10).  Defendants' explanation is "clear and specific." *See Dister*, 859 F.2d at 1115.

Plaintiff relies on *Dister* for the proposition that the Court can disregard Defendants' explanation if it is "shown to be unworthy of belief." (*See* Pl. Opp. 19 (quoting *Dister*, 859 F.2d at 1113)). However, Plaintiff has misread *Dister*. Plaintiff has the opportunity to show that Defendants' purportedly nondiscriminatory reason is unworthy of belief during the third and final step of *McDonnell Douglas*, not before. *See Dister*, 859 F.2d at 1113. In the intermediate stage, the employer is merely "required to articulate — but not prove — a legitimate, nondiscriminatory reason for the discharge." *Id.* at 1115. "The defendant need not persuade the court that it was actually motivated by the proffered reasons. ... It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254. Defendants have undoubtedly met this burden by providing evidence of DeGennaro's investigation and its conclusions, and therefore have rebutted the presumption raised by Plaintiff's *prima facie* case.

### 3. Plaintiff Has Failed to Identify a Triable Issue of Pretext

Having been shorn of the presumption established by her *prima facie* case, Plaintiff now carries the burden of showing that "the articulated justification is in fact a pretext for discrimination." *Dabney* v. *Christmas Tree Shops*, 958 F. Supp. 2d 439, 450 (S.D.N.Y. 2013), *aff'd sub nom. Dabney* v. *Bed Bath & Beyond,* 588 F. App'x 15 (2d Cir. 2014) (summary order). "Although Plaintiff may not simply rely on having made a *prime facie* case, ... pretext may be demonstrated either by presentation of additional evidence ... or by reliance on the evidence comprising the *prima facie* case, without more." *Khan* v. *Hilton*

*Hotels Inc.*, No. 13 Civ. 1919 (LTS) (DCF), 2015 WL 10851362, at *3 (S.D.N.Y. Aug. 3, 2015) (internal citations, quotation marks, and brackets omitted). Ultimately, Plaintiff must "present[] sufficient admissible evidence from which a rational finder of fact could infer that more likely than not she was the victim of ... discrimination." *Bickerstaff* v. *Vassar Coll.*, 196 F.3d 435, 447 (2d Cir. 1999).

Plaintiff makes three principal arguments. *First*, Plaintiff contends that the evidence raises a triable issue as to the core legitimacy of DeGennaro's investigation. (*See* Pl. Opp. 19). In Plaintiff's view, the evidence shows that DeGennaro engaged in a sham investigation, and that he "had already determined to fire Ms. Hamilton from the outset." (*Id.* at 20). Regarding the initial corporal punishment investigation, Plaintiff contends that the evidence shows that DeGennaro intentionally overlooked critical exculpatory evidence demonstrating that A.C.'s scratches were self-inflicted and that A.C. fabricated the allegation against Plaintiff. (*See id.* at 19-20).

It is true that "pretext can be established by a showing that the 'asserted neutral basis was so ridden with error' that the employer obviously could not have honestly relied on it." *Dister*, 859 F.2d at 1113 (quoting *Lieberman* v. *Gant*, 630 F.2d 60, 65 (2d Cir. 1980)). With that said, the Court is also reminded that "[i]n a discrimination case ... we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what *motivated* the employer." *McPherson* v. *N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) (emphasis in original) (internal quotation marks omitted).

23

Therefore, before further analysis, it must be noted that it is irrelevant whether Plaintiff did or did not in fact scratch A.C. on March 17, 2016. All that matters is whether the evidence shows that DeGennaro was indeed motivated by the conclusions of his investigations, or whether instead some manner of discriminatory intent played a role.

Reviewing the record before it, the Court finds no triable issue as to whether DeGennaro's "asserted neutral basis was … ridden with error." *See Dister*, 859 F.2d at 1113. DeGennaro did not initiate his original investigation into Plaintiff *sua sponte*; he only opened an investigation into Plaintiff after DeSantis and Maskara came to him on March 17, 2016, and reported that they had seen Plaintiff grab A.C. (*See* Mildner Decl., Ex. D at 87:8-88:21). Over the course of several months, DeGennaro interviewed numerous potential witnesses in an effort to ensure the investigation was "done correctly" (*see id.* at 131:12-20); received written statements from those witnesses (*see id.*, Ex. F, G, H, I, J, K, L, M, N, O, P); and met with Plaintiff multiple times to discuss the allegations against her (*see id.*, Ex. X). Moreover, a union representative accompanied Plaintiff to her meetings with DeGennaro, at which DeGennaro discussed with Plaintiff all the evidence he had gathered and gave Plaintiff the opportunity to rebut that evidence. (*See id.*).

As evidence of apparent deficiencies in the investigation, Plaintiff relies heavily on what she claims is DeGennaro's overlooking of Nurse Kerr's two statements — one of which expresses a belief that A.C.'s scratches were self-inflicted and both of which show A.C. changing his story about the source of

his scratches. (*See* Pl. Opp. 19-21; *see also* Mildner Decl., Ex. F, O). However, the record indicates that DeGennaro considered Nurse Kerr's statements and found, within the context of all the evidence before him, that it was more likely than not that Plaintiff caused A.C.'s injury. (*See* Mildner Decl., Ex. D at 163:19-164:7). Plaintiff also focuses on a potential ambiguity about the location of A.C.'s scratch (*see* Pl. Opp. 20) — whether it was on the forearm, as indicated in Nurse Kerr's report (*see* Mildner Decl., Ex. F) or on the upper arm (*see id.*, Ex. D at 146:4-6). But the record indicates that even given this ambiguity, DeGennaro concluded Plaintiff was responsible for the injury based on his personal observation of the scratch and the consistency between the location of the scratch and what A.C., DeSantis, and Maskara had told him. (*See id.* at 147:15-148:7, 164:24-165:3). Viewing the evidence of DeGennaro's investigation as a whole, instead of analyzing it in piecemeal fashion, *see O'Toole* v. *Cty. of Orange*, 255 F. Supp. 3d 433, 441 (S.D.N.Y. 2017) (explaining that "courts should evaluate the facts holistically" instead of in a "piecemeal fashion"), the record demonstrates that DeGennaro carried out a careful investigation into the corporal punishment allegation against Plaintiff and thoughtfully considered the evidence in reaching his conclusion.

The same can be said for DeGennaro's investigation into whether Plaintiff interfered with potential witnesses. It is undisputed that Plaintiff confronted DeSantis and Maskara later in the day on March 17, 2016, and told the pair "what goes around comes around." (Def. 56.1 Reply ¶ 50). It is equally undisputed that Plaintiff called Carter on the evening of May 2, 2016, and

warned Carter not to trust or talk to the school administration. (*See* Mildner Decl., Ex. W). And there is no contest in the record or by the parties that both DeGennaro and DeSantis interpreted Plaintiff's remarks on March 17, 2016, as threats. (*See* Mildner Decl., Ex. D at 194:6-9; *see also id.*, Ex. S at 122:23-123:4). In response to these undisputed facts, Plaintiff responds with a collection of negative inferences regarding whether DeGennaro ever directly asked DeSantis if she felt intimidated or threatened by Plaintiff, or whether Plaintiff's comments to Carter or DeSantis actually impeded the investigation. (*See* Pl. Opp. 21). But when viewed in the larger context of DeGennaro's conduct of the investigation — collecting witness statements and providing Plaintiff with the opportunity to respond to the allegations and evidence (*see* Mildner Decl., Ex. M, N, V, W, Y) — and DeGennaro's personal evaluation that the statements sounded like efforts to intimidate (*see id.*, Ex. D at 195:3-11), these negative inferences are not enough to allow a rational fact-finder to infer that DeGennaro's investigation, and the conclusions he drew from them, were pretextual. Insofar as the legitimacy of the investigation is concerned, Plaintiff has failed to raise a genuine dispute of material fact.

    *Second*, Plaintiff seeks to make a showing of pretext by making an argument of disparate treatment. In discrimination cases, "[d]isparate treatment based on 'inconsistent application of ... disciplinary policy' is also relevant evidence of pretext, ... so long as the employees are similarly situated." *Khan*, 2015 WL 10851362, at *3 (internal citation omitted) (quoting *Greenway* v. *Buffalo Hilton Hotel*, 143 F.3d 47, 51 (2d Cir. 1998)). Specifically, the Second

Circuit requires that a plaintiff demonstrate that she is "similarly situated in all material respects" to those individuals with whom the plaintiff seek comparison. *See Risco* v. *McHugh*, 868 F. Supp. 2d 75, 100 (S.D.N.Y. 2012) (quoting *Graham* v. *Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). "What constitutes 'all material respects' varies from case to case, but ... requires 'a reasonably close resemblance of facts and circumstance' and ... an objectively identifiable basis for compatibility." *Id.* (internal citations omitted).

As a comparator, Plaintiff points to the manner in which DeGennaro dealt with Brett Vasquez, a 22-year-old Hispanic paraprofessional of Puerto Rican origin. (*See* Pl. Opp. 22-23). DeGennaro substantiated allegations against Vasquez in 2015, after an incident during which Vasquez was reported to have lifted a student up in order to bring the student into a classroom. (*See* Mildner Decl., Ex. D at 71:16-24). It is undisputed that Plaintiff and Vasquez held the same position, were subject to the same workplace standards, and were disciplined by the same supervisor. *See Risco*, 868 F. Supp. 2d at 100; *see also Barella*, 16 F. Supp. 3d at 163. However, Vasquez was not terminated; instead, Vasquez received a letter on his personnel file and an hour-or-so-long conversation about better ways to handle students. (*See* Def. 56.1 Reply ¶ 106). Defendants argue, and DeGennaro testified, that the reason for this disparate treatment between Plaintiff and Vasquez is that Vasquez's actions did not result in any physical injury to the student. (*See* Def. Reply 4; *see also* Mildner Decl., Ex. D at 73:9-22). Plaintiff, on the other hand, asserts that this disparate treatment raises a triable issue as to pretext, especially given

DeGennaro's testimony, according to Plaintiff, that Vasquez was not fired because he "was a very young paraprofessional." (*See* Pl. Opp. 23).

Plaintiff's argument fails for three reasons. *First*, Plaintiff's reliance on DeGennaro's testimony about Vasquez's youth is faulty. Any reasonable reading of DeGennaro's testimony shows that DeGennaro chose not to terminate Vasquez because the student in question was not physically injured. (*See* Mildner Decl., Ex. D at 73:9-74:24). It is clear from the record that DeGennaro's statement that "Brett was a very young paraprofessional" was not given as a rationale for his decision not to terminate Vasquez.

*Second*, it is unclear whether Plaintiff and Vasquez are similarly situated given the differences in the charges against them. DeGennaro only substantiated allegations of corporal punishment against Vasquez, while he substantiated allegations of both corporal punishment and interference in the investigation against Plaintiff. *Cf. Toussaint* v. *N.Y. Dialysis Servs., Inc.*, 230 F. Supp. 3d 198, 217 (S.D.N.Y. 2017) (finding two employees were not similarly situated due to differences in their disciplinary histories).

*Third*, and most importantly, Vasquez is not an appropriate comparator because his conduct was not as severe as Plaintiff's. In order for employees to be similarly situated, "a plaintiff must show that those employees engaged in acts of comparable seriousness." *Risco*, 868 F. Supp. 2d at 100. "A proposed comparator is not similarly situated ... unless she engaged in all of the same misconduct as plaintiff, or at least committed the most serious of the infractions for which the plaintiff was subjected to an adverse employment

28

action." *Id.* While Vasquez did indeed engage in corporal punishment, his actions were not of comparable seriousness with Plaintiff's because his did not result in physical injury to the student. DeGennaro testified that if Vasquez had left a scratch and a mark on the student, as Plaintiff did, it is "very possible" that Vasquez also would have been fired. (*See* Mildner Decl., Ex. D at 74:20-24). Plaintiff argues that this distinction between corporal punishment resulting in injury and corporal punishment not resulting in injury is "arbitrary." (*See* Pl. Opp. 23). The case law on this issue disagrees. *See, e.g.*, *Blair* v. *N.Y.C. Transit Auth.*, No. 14 Civ. 5091 (ENV) (PK), 2016 WL 6405900, at *4 (E.D.N.Y. Oct. 27, 2016). Thus, Plaintiff cannot make a showing of pretext by pointing to disparate treatment between herself and Vasquez. For the reasons provided above, Plaintiff's disparate treatment argument also fails as to Michael Gilman[5] and "Evelyn," two paraprofessionals who also committed corporal punishment that did not result in injury to the student. (*See* Def. 56.1 Reply ¶¶ 108, 110).

For her third argument, Plaintiff points to her replacement by Hernandez, a younger Hispanic woman of Dominican origin, as evidence of pretext. (*See* Pl. Opp. 24). As previously discussed, evidence of a plaintiff being replaced by someone outside their protected class is sufficient to establish a *prima facie* case of discrimination. *See Zimmerman*, 251 F.3d at 381. However, while that evidence may be enough to satisfy the minimal

---

[5] Michael Gilman is also identified in the pleadings and other materials as Michael Gilmore or Mike Gilmore.

requirements of a *prima facie* case, it is not enough on its own to raise a genuine dispute of material fact as to pretext. *See Dabney,* 958 F. Supp. 2d at 453 (finding that plaintiff's replacement by a white employer was insufficient evidence for a reasonable jury to find that defendants' nondiscriminatory reason was pretextual). Plaintiff cites to *Khan* v. *Hilton Hotels* and *Epstein* v. *Kalvin-Miller International, Inc.* as support for her reliance on this replacement theory (*see* Pl. Opp. 24), but neither case controls in the instant action. While the *Khan* court found that the plaintiff had successfully raised genuine disputes of material fact as to pretext, the plaintiff's replacement by an "under-qualified, much younger employee" was only one part of a much larger evidentiary whole supporting that conclusion. *See Khan,* 2015 WL 10851362, at *3. The court also relied on evidence that the employer had directly questioned the plaintiff about his intention to retire and that the company as a whole had exhibited a pattern of replacing its customer-facing staff with younger employees. *See id.* In the instant action, Plaintiff is not able to point to any additional evidence with which she might be able to similarly buttress her replacement-related evidence.

 *Epstein* is inapposite for similar reasons: in addition to evidence of replacement by someone outside the protected class, the court also relied on evidence that "the persons responsible for making discharge decisions ... considered the age, gender, race and disability status of employees" together with evidence of disparate treatment. *Epstein* v. *Kalvin-Miller Int'l, Inc.*, 21 F. Supp. 2d 400, 405 (S.D.N.Y. 1998). As discussed above, Plaintiff is unable to

point to any other evidence demonstrating pretext.  Therefore, given the lack of

evidence in the record to accompany Plaintiff's replacement theory, that

theory — without more — is not enough to raise a genuine dispute of material

fact.

As a final matter, Plaintiff's Complaint offers numerous allegations that

could provide evidence of pretext.  Specifically, Plaintiff has alleged: (i) Plaintiff

heard from coworkers that DeGennaro had been hired to get rid of older staff

members at P721X, and was given a financial incentive to do so; (ii) DeGennaro

had forced out other minority staff members at P721X, including Michael

Gilman, Gail Grant, Juana Palonia,[6] and Charlie Thompkins; (iii) since

DeGennaro became principal of P721X, 33 staff members — most of whom

were over 40 years old — had been forced out and replaced by younger,

Caucasian staff; and (iv) DeGennaro had pressured staff members to fabricate

allegations against Plaintiff.  (*See* Addendum to Compl. 8-9).  Notably, Plaintiff

relies on none of the above allegations to support her discrimination claim in

her briefing.  This is likely because all of these allegations are either

conclusory, unsupported by the record, or based on inadmissible hearsay.  For

example, Plaintiff's allegation regarding the forcing out of minority staff

members cannot support Plaintiff's discrimination claim.  Gail Grant was a

substitute teacher working at P721X on a temporary basis and therefore was

not "forced out" (Def. 56.1 Reply ¶ 89); it is undisputed that Michael Gilman

---

[6]     Juana Palonia is also identified in the pleadings and other materials as Juana Paloma
        and Wanda Polaco.

and Juana Palonia were terminated for legitimate disciplinary reasons (*id.* at ¶¶ 95, 98); and Plaintiff was not able to offer any concrete evidence as to why Charlie Thompkins was fired (*id.* at ¶ 92). None of the above information, taken separately or as a whole, would lead a rational factfinder to infer that Plaintiff's termination was due to discrimination.

Plaintiff also has no valid support for her allegations concerning whether DeGennaro had been hired specifically to get rid of older staff members or whether DeGennaro had pressured staff members to fabricate allegations against Plaintiff. The only support on which Plaintiff can rely for either amounts to inadmissible hearsay. In the case of the former, Plaintiff's only support is the out-of-court statements of Michael Gilman and Charlie Thompkins (*see* Mildner Decl., Ex. A at 148:10-22), neither of which would qualify for a hearsay exception. As for the latter, Plaintiff can point only to her testimony concerning her May 2 phone call with Carter, during which Carter supposedly told Plaintiff that DeGennaro had pressured Carter to change her story. (*See id.* at 103:9-19). This out-of-court statement, offered for its truth, would also not qualify for any hearsay exception. Since both allegations would be inadmissible, they cannot be considered on summary judgment. *See Talisman Energy, Inc.*, 582 F.3d at 264.

Viewing the record as a whole, Plaintiff has failed to meet her burden to raise a triable issue as to whether Defendants' nondiscriminatory reasons were pretextual. This is the case whether the Court analyzes the evidence using the ADEA's heightened "but-for" causation requirement, *see Gorzynski*, 596 F.3d at

106, or Title VII's lower requirement that the plaintiff merely prove that the employer's decision was based "in part" on discrimination, *see Sullivan*, 166 F. Supp. 3d at 99. While the Court is cognizant of its responsibility in employment discrimination cases to be cautious in its use of summary judgment, *see Gorzynski*, 596 F.3d at 101, no reasonable jury could find that Plaintiff was terminated due to discrimination. Instead, the evidence comports with Defendants' stated rationales: DeGennaro received a report of corporal punishment; he diligently investigated that report; and he arrived at the conclusion that Plaintiff had indeed committed corporal punishment (and subsequently interfered with his investigation). Accordingly, the Court grants the Defendants' motion for summary judgment.

## CONCLUSION

For the reasons set forth in this Opinion, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated: November 25, 2019
        New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge